UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NEBRASKALAND INC.,

Plaintiff,

-against-

HSBC BANK USA, N.A.,

Defendant.

26-cv-5622 (AS)

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

In October 2025, Nebraskaland's bank account was hacked. Third parties got hold of Nebraskaland's login credentials, took control of its account with HSBC Bank, and executed hundreds of fraudulent transactions. Three days later, HSBC flagged a transaction as suspicious, Nebraskaland blocked it, and within a few hours they both realized what had happened. But not before Nebraskaland had lost over $5,000,000, most of which it was unable to recover.

Nebraskaland now sues HSBC, arguing that the bank should have flagged suspicious transactions sooner and that its deficient security measures were to blame for Nebraskaland's losses. Nebraskaland also claims that HSBC breached its duties to Nebraskaland in the aftermath of the incident, including by refusing to investigate until Nebraskaland signed indemnification agreements. HSBC moves to dismiss. For the reasons below, HSBC's motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Nebraskaland bills itself as the "premier perishable meat supplier in the Northeast." *Home*, Nebraskaland, http://nebraskaland.com [https://perma.cc/5EUB-A6MU] (last visited November 3, 2026). It was established by Richard Romanoff who "at age 26, founded the company selling oxtails in New York City." *About Us*, Nebraskaland, https://nebraskaland.com/about-us/ [https://perma.cc/W5UH-4HBP] (last visited November 3, 2026).

Sometime before October 17, 2025, third party fraudsters got access to Nebraskaland's user IDs for its HSBC account. Dkt. 13-2 (FAC) ¶¶ 7–8. Then, on October 17, the fraudsters called Nebraskaland from phone numbers that appeared to be associated with HSBC, posing as HSBC employees, and obtained information from Nebraskaland that allowed them to change the credentials of Nebraskaland's administrators. *Id.* ¶¶ 9–10. This locked Nebraskaland out of its own account. *Id.* ¶ 13. HSBC did not notify Nebraskaland that its administrative credentials (which had stayed the same for 20 years) had been changed. *Id.* ¶¶ 9, 12.

Later that day, the fraudulent transactions started. On October 17, 2025, the fraudsters executed nineteen fund transfers to accounts that Nebraskaland had never sent money to before. *Id.* ¶¶ 14–

16, 23. Six of these were marked as "investments," averaging $80,000. *Id.* ¶ 14. The other thirteen were each for $19,999 and marked as "payroll." *Id.* ¶¶ 15–16. On October 20, 2025, there was another batch of nearly 200 "payroll" transactions, with most of them again for amounts just under $20,000. *Id.* ¶¶ 17–21. HSBC did not flag any of these transactions as suspicious. *Id.* ¶ 22.

Finally, at 2:45 p.m. on October 20, HSBC notified Nebraskaland of a single suspicious transfer of $19,999. *Id.* ¶¶ 25–26. Nebraskaland immediately told HSBC to deny the transfer, which it did. *Id.* ¶ 27. However, HSBC did not tell Nebraskaland about the deluge of similar transfers, so Nebraskaland wrongly assumed that it was the only one. *Id* ¶ 28. In the ensuing hours, HSBC processed additional fraudulent transfers totaling $2,500,000, before finally putting a stop to them. *Id.* ¶¶ 29, 32. HSBC reached out to other banks to try to recover the lost funds but was only able to recover a little over $500,000. *Id.* ¶ 34. All told, Nebraskaland lost over $4,500,000. *Id.* ¶ 7.

In the aftermath of the fraud, HSBC asked Nebraskaland to sign multiple indemnity agreements, memorializing that HSBC had done nothing wrong and releasing HSBC from any liability regarding the incident. *Id.* ¶¶ 35–42, 74–86. HSBC told Nebraskaland that it wouldn't investigate or release the recovered funds until Nebraskaland signed the agreements. *Id.* Based on these representations, Nebraskaland signed the agreements. *Id.* HSBC also offered Nebraskaland $5,000,000 in additional financing and charged it an audit fee of over $13,000, despite never intending to make the financing available. *Id.* ¶¶ 105–08. HBSC's conduct caused Nebraskaland's credit rating to be downgraded and four long-time suppliers to cut ties. *Id.* ¶¶ 109–10. Nebraskaland had to reduce inventory and offer customers steep discounts to meet its financial obligations. *Id.* ¶¶ 111–13.

## LEGAL STANDARDS

To survive a motion to dismiss for failure to state a claim, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 298–99 (2d Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is plausible on its face 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). When evaluating whether a complaint clears this bar, the Court must "accept[] all factual allegations in the complaint as true[] and draw[] all reasonable inferences in the plaintiff's favor." *Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).

## DISCUSSION

### I. The Article 4-A claim survives

Nebraskaland's first claim arises under Article 4-A of New York's Uniform Commercial Code ("UCC"). "Article 4-A of the UCC governs the procedures, rights, and liabilities arising out of commercial electronic funds transfers." *Banco del Austro, S.A. v. Wells Fargo Bank, N.A.*, 215 F. Supp. 3d 302, 303 (S.D.N.Y. 2016) (cleaned up). While Nebraskaland styles this as two claims (one for a violation of § 4A-202, another for a violation of § 4A-204), Dkt. 13-2 ¶¶ 48–63, it's

really just one claim. Section 4-A-202 classifies certain transactions as "authorized" and "effective," and § 4-A-204 provides that a bank must refund customers for unauthorized and ineffective transfers. Article 4-A's "default rule" is to "allocate[] the risk of loss to the bank that received and honored the unauthorized orders." *Banco del Austro*, 215 F. Supp. 3d at 304.

### A. "Unauthorized"

HSBC's first argument is that it shouldn't have to refund Nebraskaland because the complaint does not plausibly allege that the transactions were unauthorized. Dkt. 13 at 9. Under § 4-A-202, a payment is "authorized" if "the person identified as [the] sender" authorized the payment or "is otherwise bound by it under the law of agency." N.Y. U.C.C. § 4-A-202(1). HSBC argues that since the complaint is silent as to how the fraudsters got HSBC's login credentials, the only "reasonable inference" is that Nebraskaland "gave the scammers its passwords." Dkt. 13 at 10. In that case, the argument goes, Nebraskaland would have "mistakenly" conferred authority to the fraudsters, who then acted as its agents when authorizing the transactions. *Id.*

Even assuming Nebraskaland did give the scammers its passwords on the phishing call, HSBC cites no authority supporting the notion that—after tricking someone into giving up their passwords—a scammer then acts as that person's *agent* when stealing their money. Whether the theory is actual authority or apparent authority, an agency relationship requires "consent by one person to another that the other shall act on his behalf and subject to his control," which isn't present here. *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 122 (2d Cir. 2001) (quoting *Meese v. Miller*, 436 N.Y.S.2d 496, 499 (4th Dep't 1981)). While HSBC relies on *Niram, Inc. v. Sterling Nat'l Bank*, 697 F. Supp. 3d 15 (S.D.N.Y. 2023), the transactions in that case were initiated by *the company's legitimate authorized users*, who the scammers had tricked into transferring them money. *Id.* at 20. The Court found that those transactions were authorized because those employees had actual authority to conduct the transfers. *See id.* at 25–27. Here, by contrast, the people initiating the transfers were the scammers themselves, who had hacked into Nebraskaland's account. Those scammers did not gain Nebraskaland's "consent" to conduct the transfers simply by tricking the company into revealing its passwords. *Tradeline*, 266 F.3d at 122.

### B. "Ineffective"

Even if a transfer is unauthorized, the bank isn't on the hook for a refund if the transfer is "effective" as that customer's order, *i.e.*, if (1) the "bank and its customer have agreed that the authenticity of payment orders . . . will be verified pursuant to a security procedure," (2) the security procedure is "commercially reasonable," and (3) the "bank proves that it accepted the payment order in good faith and in compliance with the bank's obligations under the security procedure." N.Y. U.C.C. § 4-A-202(2); *see also id.* § 4-A-204 (only ordering a refund if the payment order is "not effective as the order of the customer under Section 4-A-202"). Nebraskaland's complaint says that HSBC "failed to implement commercially reasonable security procedures," FAC ¶ 50, without identifying any specific security procedures HSBC did employ. HSBC argues that this "wholly conclusory allegation" is insufficient to establish that the orders were ineffective. Dkt. 13 at 11.

But this argument by HSBC is ill suited for the motion-to-dismiss stage. The complaint says that HSBC did not implement any commercially reasonable security procedures and alleges facts to support that contention. For example, the complaint alleges that HSBC allowed third parties to change three administrative IDs that had remained unchanged for approximately twenty years without notifying Nebraskaland, and then processed 23 wire transfers and 203 ACH transactions without triggering any immediate fraud alerts, despite the unusually high volume of transactions and the fact that they were initiated using a method Nebraskaland had never employed. FAC ¶¶ 51–54. HSBC points to the Master Services Agreement ("MSA"), the contract governing its provision of banking services and the parties' respective obligations.[1] But it just references "Security Procedures" in general terms, without listing any specific measures HSBC implemented to protect Nebraskaland's account. Dkt. 13-4, MSA §§ 3.1, 20. The complaint thus sufficiently alleges that HSBC failed to implement commercially reasonable security procedures. *See Banco del Austro*, 215 F. Supp. 3d at 306 (denying motion to dismiss because of the "fact-intensive nature of the commercial reasonableness inquiry").

HSBC also argues that it accepted the payment order in "good faith" (the third prong of the effectiveness test). Dkt. 13 at 11. But this is even more of an uphill battle, since HSBC has the burden to "prove[]" that it accepted the payment order in good faith. N.Y. U.C.C. § 4-A-202(2). The UCC defines good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing," *id.* § 4-A-105(1)(f), and the inquiry "includes both objective and subjective components," *Banco del Austro*, 215 F. Supp. 3d at 305. Based on the same allegations recounted above, the Court cannot say at this stage that HSBC acted in good faith—much less that it has *proven* that it acted in good faith.

Finally, HSBC argues that under Section 4-A-203, it can "limit the extent to which it is entitled to enforce or retain payment" of payment orders "[b]y express agreement." N.Y. U.C.C. § 4-A-203(1)(a). HSBC argues it did so in the MSA. But HSBC misunderstands Section 4-A-203, which provides "rules" that only kick in when the payment order "is effective as an order of the customer pursuant to subsection (2) of Section 4-A-202." *Id.* § 4-A-203(1). So this argument assumes that the payment orders here were effective, which the Court can't determine at this stage.

---

[1] HSBC attaches the MSA to its motion to dismiss, Dkt. 13-4, and relies on it throughout. Although Nebraskaland's complaint doesn't mention the MSA, it doesn't contest the authenticity of the MSA or HSBC's characterization of it. In fact, Nebraskaland itself relies on the MSA in its opposition. *See, e.g.*, Dkt. 18 at 6. Even when a document is not explicitly incorporated by reference into the complaint, a court deciding a motion to dismiss may consider the document if it is "integral" to the complaint. *Chambers*, 282 F.3d at 153.; *see also 218 Broadway, LLC v. J.P. Morgan Chase Bank, N.A.*, 2026 WL 2364628, at *5–6 (S.D.N.Y. Aug. 14, 2026) (considering similar contracts on motion to dismiss claims related to processing fraudulent transactions). Because Nebraskaland doesn't object to the Court considering the MSA and appears to agree that it governs the parties' relationship, the Court will consider it for purposes of this motion.

In sum, Nebraskaland's complaint plausibly alleges that (1) these transactions were unauthorized and ineffective, and (2) HSBC is therefore obligated to provide refunds under Article 4-A.

## II. Nebraskaland's common law claims can proceed, except for the tortious interference claim

Nebraskaland also brings common law claims against Nebraskaland for (1) negligence, (2) fraudulent inducement, and (3) tortious interference. HSBC argues that these claims are precluded by Article 4-A and also fail on the merits.

### A. Preclusion

As the Second Circuit explained in *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 87–90 (2d Cir. 2010), Article 4-A "was enacted to create a 'comprehensive body of law' that 'use[s] precise and detailed rules to assign responsibility.'" *Id.* at 89 (quoting N.Y. U.C.C. § 4-A-102 cmt.) (alteration in original). Previously, courts had "refer[red] to general principles of common law or equity" to "resolve[] disputes over funds transfers." *Id.* (quoting N.Y. U.C.C. § 4-A-102 cmt.). Article 4-A opted to replace this "piecemeal approach" with "a more disciplined regime under which common law claims at odds with Article 4A are no longer permitted." *Id.* So courts have held that "Article 4A precludes customers from bringing common law claims inconsistent with the statute." *Id.*

But "[n]ot all common law claims are per se inconsistent with this regime." *Id.* The focus of Article 4-A is on "how electronic funds transfers are conducted," so claims that are "not about the mechanics of how a funds transfer was conducted" might not be precluded. *Id.* The "critical inquiry" is whether the provisions in Article 4-A "protect against the type of underlying injury or misconduct alleged in a claim." *Id.* at 89–90. In *Ma*, the Second Circuit concluded that "all of Ma's claims are, at their core, assertions that he did not order or approve any of the disputed electronic transfers of funds from his accounts," so they all fell within the scope of Article 4-A. *Id.* at 90.

Broadly speaking, Nebraskaland's claims fall into three buckets. In the first bucket are claims based on HSBC's *processing* of the transfers. Nebraskaland argues that HSBC should have alerted it to suspicious activity sooner, should have stopped processing transactions once it flagged one as suspicious, and so on. To the extent Nebraskaland's common law claims are based on this misconduct, they are clearly precluded. These claims are about "how electronic funds transfers [were] conducted," which is the core focus of Article 4-A. *Id.* at 89.

In the second bucket are claims based on HSBC's *failure to cancel* transactions after it learned they were fraudulent. While this seems further afield of Article 4-A (since it involves trying to recover funds rather than processing the fraudulent transactions in the first place), the Second Circuit has dealt with a similar fact pattern and held that these sorts of claims are preempted as well. *See Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 801 (2d Cir. 2011) (affirming dismissal on preclusion grounds of a claim that a bank had "failed to exercise reasonable care because it waited some fifteen hours to try to cancel the two wire transactions after it was asked to do so").

At the hearing on this motion, counsel for HSBC conceded that its common law claims are precluded to the extent they fall into these first two buckets.

There's a third bucket, however, of claims based on HSBC's conduct in the aftermath of the fraud. This includes refusing to investigate until Nebraskaland signed an indemnity agreement and promising to provide financing without intending to do so. Because these claims are "not about the mechanics of how a funds transfer was conducted," they fall outside the scope of Article 4-A and are not preempted. *Ma*, 597 F.3d at 89. This isn't to say that Nebraskaland has alleged viable claims based on this conduct (the Court addresses that question next). But if it has, then those claims are not precluded by Article 4-A.

### B. Merits

#### *1. Fraudulent inducement*

To state a claim for fraudulent inducement, Nebraskaland must allege "(1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury." *Computerized Radiological Servs. v. Syntex Corp.*, 786 F.2d 72, 76 (2d Cir. 1986) (quoting *Brown v. Lockwood*, 432 N.Y.S.2d 186, 193 (2d Dep't 1980)). Fraud claims are also subject to Rule 9(b)'s heightened pleading standard. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (citing Fed. R. Civ. P. 9(b)). The complaint must therefore identify the allegedly fraudulent statements, who made them, when and where they were made, and why they were fraudulent. *Id.* Although knowledge and intent may be alleged generally, the complaint must allege facts supporting a strong inference of fraudulent intent. *Id.* at 290–91.

Nebraskaland satisfies Rule 9(b), as the complaint identifies specific statements by named HSBC employees concerning the release and indemnity agreements. On October 27, 2025, Michael Cuoco, a senior associate relationship manager at HSBC, provided a counter-indemnity document and represented that Nebraskaland had to sign it for HSBC's Major Investigations team to investigate the fraud. FAC ¶ 74. On November 2, Gareth Roberts, Nebraskaland's account representative at HSBC, said that the bank's financial crime investigation team had confirmed that it would not investigate or retrieve the funds without signed agreements, and that declining to sign "jeopardizes the chances of recovery as no further action can be taken." *Id.* ¶¶ 75–76. Roberts later said that funds would remain held until Nebraskaland signed the indemnity agreements. *Id.* ¶ 82. Nebraskaland alleges that it signed these agreements in reliance on HSBC's representations, believing it needed to do so to obtain an investigation and recover its money. *Id.* ¶ 86.

HSBC's strongest objection is that the complaint fails to allege falsity. Dkt. 13 at 24. HSBC argues that the statements "concern [HSBC]'s purported legal position and conditions for post-loss recovery, not false statements of present fact." *Id.* That is a fair point. Was HSBC really *lying* when it said Nebraskaland had to sign a release before it would investigate the fraud or help recover the funds? Or was it simply staking out an aggressive negotiating position? *Cf. Carolina Cas. Ins.*

*Co. v. Cap. Trucking, Inc.*, 523 F. Supp. 3d 661, 680 (S.D.N.Y. 2021) (rejecting fraud claims based on "arguments advanced by attorneys" rather than "factual statements made by the alleged tortfeasors"). Even if insisting on a release might make the agreement unenforceable (because of a defense like duress), that does not necessarily mean HSBC lied to obtain it.

At this stage, though, Nebraskaland plausibly alleges falsity. HSBC told Nebraskaland that substantial funds remained available for recovery and that recovery could only occur if it signed the release. FAC ¶ 37. What's more, it presented that requirement as one confirmed by its investigation team. *Id.* ¶ 76. But HSBC would have known all of that was false. In reality, HSBC didn't need to obtain a release from Nebraskaland to investigate the missing funds, and there was actually very little money to recover. *Id.* ¶¶ 34, 37, 39, 42–43, 84–86.

HSBC's remaining arguments can be disposed of quickly. The fact that HSBC helped Nebraskaland recover some funds does not mean it didn't fraudulently induce it to release claims. Nor does the fact that Nebraskaland is a sophisticated party by itself defeat reasonable reliance. Even if it knew that it was releasing claims, it didn't know that HSBC's explanation for requiring it was false. *See STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011) ("[R]easonable reliance is often a question of fact for the jury rather than a question of law for the court.").

Finally, Rule 9(b) does not require Nebraskaland to attach the release. The complaint describes the terms of the contracts and alleges that Nebraskaland gave up specific rights in reliance on HSBC's statements. FAC ¶¶ 40, 86–87. And because Nebraskaland seeks rescission, it doesn't need to allege a separate pecuniary loss. *See Sabby Healthcare Master Fund Ltd. v. Microbot Med. Inc.*, 120 N.Y.S. 3d 281, 283 (1st Dep't 2020) ("[N]o showing of pecuniary loss is needed to support a claim for fraudulent inducement based on rescission."). HSBC's motion to dismiss the fraudulent inducement claim is therefore denied.

#### 2. *Negligence*

Nebraskaland's negligence claim survives for similar reasons. "To establish liability under New York law, a plaintiff must prove (1) that the defendant owed [it] a duty; (2) that the defendant breached that duty; and (3) that [it] suffered injuries proximately resulting from that breach." *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020). Nebraskaland alleges that HSBC owed it "a duty to exercise reasonable care in safeguarding Nebraskaland's account," and that it breached that duty by "[c]ondition[ing] its fraud investigation on Nebraskaland's execution of a release and indemnity agreement purporting to hold HSBC harmless."[2] FAC ¶¶ 90, 91(f). Notably, this theory does not depend on HSBC making any false statements. Instead, Nebraskaland simply argues that HSBC acted negligently and wasted valuable time by delaying its investigation into the fraud while it tried to obtain a sweeping indemnity agreement from Nebraskaland.

[2] Nebraskaland also bases this claim on other conduct related to HSBC's processing of the transactions, *see* FAC ¶ 91(a)–(e), but any claim based on those allegations is preempted by Article 4-A. *See supra* Part II.A.

HSBC argues that this claim fails because the parties' "banking relationship is governed by contractual obligations, not common law duty." Dkt. 13 at 15. But "banks owe a duty of care to their customers" that can be "independent of any alleged contractual obligations." *Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 667 (S.D.N.Y. 2000); *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 235 (5th Cir. 2010) ("Although its scope is not well developed, New York law does recognize that banks and brokers owe a duty of care to their customers."). The fact that the parties also had a contract governing aspects of their relationship does not automatically foreclose any extra-contractual common law duty.

Next, HSBC argues that Nebraskaland's complaint fails to plausibly allege breach and causation, since the complaint alleges that "[d]uring a discussion between Nebraskaland and HSBC, HSBC revealed that HSBC's Fraud Department communicated with all the banks involved in the transfers and requested that they put all wires and ACH on hold," after learning from Nebraskaland that the transactions were fraudulent. FAC ¶ 32. So HSBC argues that it did everything it could to try to freeze funds, meaning (1) there's no breach and (2) any damages weren't caused by its indemnity-agreement shenanigans.

Discovery may prove HSBC correct here, but at this stage all we have is an allegation that HSBC *said* they told the receiving banks to put everything on hold. We don't know whether that is accurate, and we also don't know whether HSBC could have been taking additional steps to try to recover the transferred funds. It seems that there must have been *some* steps HSBC could take to help recover money—since that's what HSBC was telling Nebraskaland when it was pressuring the company to sign indemnity agreements. So HSBC's motion to dismiss the negligence claim is denied as well.

### 3. *Tortious interference*

Nebraskaland's tortious interference claim fails, however, because the complaint does not plausibly allege that HSBC targeted its relationships with third parties. Tortious interference with business relations requires conduct "directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1104 (N.Y. 2004). And conduct that harms a business does not necessarily amount to intentional interference with its relationships. In *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 768 (2d Cir. 1995), for example, the Second Circuit rejected a tortious interference claim brought by soft-drink distributors even though the defendants allegedly drove their bottler out of business in pursuit of a monopoly. The defendants' actions had the predictable effect of scuttling the distributors' contracts with the bottler—but nothing in the complaint indicated that those third-party contracts were the "target" of the defendants' conduct. *Id.* The defendants had no more intended to interfere with those contracts than with the bottler's contracts with its telephone or electric companies. *Id.* Because the defendants' "sole interest was to achieve the soft-drink bottling monopoly," there was no claim for tortious interference. *Id.*

Here, Nebraskaland alleges that HSBC promised additional financing and charged an audit fee despite never intending to make that financing available. FAC ¶¶ 105–07. But it does not allege

facts suggesting that HSBC did so with the purpose of disrupting Nebraskaland's relationships with suppliers or customers. To be sure, disrupting those relationships was the *effect* of HSBC's actions. But the complaint suggests that the reason HSBC decided not to provide the loans was because it deemed Nebraskaland a "high risk" debtor. *Id.* ¶ 108. Even accepting that HSBC made a promise to provide financing without intending to honor it, the complaint does not connect that alleged deception to an effort to interfere with third-party relationships.

Nebraskaland does allege that HSBC knew of its payment obligations and that HSBC's conduct ultimately caused suppliers to cut ties, forced reductions in inventory, and damaged customer relationships. *Id.* ¶¶ 102–03, 110–13. But knowledge of those obligations is very different from an intent to interfere with them. *See Conte v. Emmons*, 895 F.3d 168, 172 (2d Cir. 2018) (explaining that New York law requires proof that the defendant "purposefully intended to cause a contract party to breach a particular contract"). The complaint offers no motive for HSBC wanting to harm Nebraskaland's relationships with third parties. Nor does it allege that HSBC contacted Nebraskaland's suppliers or customers, pressured them to end their relationships, or otherwise directed any conduct toward them. *See G.K.A. Beverage*, 55 F.3d at 768 ("The distributors . . . make no allegations that [defendants] had any contact with the distributors' customers or that [defendants] tried to convince the customers to make contracts with them rather than the distributors."). HSBC's motion to dismiss this claim is granted, but Nebraskaland has leave to amend if it believes it can plead additional facts to cure this defect.

## III. Nebraskaland fails to state a GBL § 349 claim

Nebraskaland also brings a claim under New York General Business Law ("GBL") § 349, which is premised on HSBC's allegedly inadequate account security and its allegedly deceptive demand that Nebraskaland sign a release before HSBC would investigate the fraud. FAC ¶¶ 68–69. This claim fails because it does not adequately allege consumer-oriented conduct.

To violate GBL § 349, the challenged conduct must have "a broader impact on consumers at large." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995). "[T]ypically, business-to-business transactions do not fall under the statute, as large businesses are not the small-time individual consumers GBL § 349 was intended to protect." *123RF LLC v. HSBC Bank USA, N.A.*, 663 F. Supp. 3d 391, 403 (S.D.N.Y. 2023) (cleaned up). "Private contract disputes, unique to the parties," for example, fall outside the statute. *Oswego*, 647 N.E.2d at 744. Although a plaintiff need not allege "repetition or pattern of deceptive behavior," it must allege facts connecting the challenged conduct to consumers more broadly. *Id.*

Here, Nebraskaland's claim is based on HSBC's handling of its accounts and the parties' negotiations following a particular incident—not conduct directed at the public at large. FAC ¶¶ 68–69. While Nebraskaland alleges generally that HSBC sells banking and fraud protection services to the public, *id.* ¶ 67, that does not mean the allegedly deceptive conduct here is consumer oriented. *See Forrence Orchards, Inc. v. TD Bank*, 766 F. Supp. 3d 364, 371 (N.D.N.Y. 2025) (explaining that "the relevant question . . . is not whether the relevant parties generally are engaged in consumer-oriented conduct, but rather, whether the *specific conduct* that is deceptive is directed

at the public at large"). In fact, the complaint says that HSBC's indemnification demands were made in response to Nebraskaland's loss and that the draft agreement was revised during the parties' negotiations. FAC ¶¶ 73–80. These allegations cut against Nebraskaland's argument that the conduct was consumer oriented. *See N.Y. Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 770 (N.Y. 1995) (holding that defendants' sale of an insurance policy to "a major university acting through its director of insurance" was not consumer-oriented conduct because, even though the policy "contained standard provisions," it "was tailored to meet the purchaser's wishes and requirements . . . through negotiation").

Nebraskaland responds that HSBC's failure to protect its accounts means similarly situated customers could suffer the same harm. Dkt. 18 at 18–19. But that reasoning would effectively eliminate the requirement of consumer-oriented conduct, because virtually any business could argue that what happened to it could happen to the defendant's other customers. The mere possibility that HSBC could repeat the alleged misconduct does not, without more, turn this private dispute into a consumer protection claim. *See 123RF LLC*, 663 F. Supp. 3d at 403 (holding that conclusory allegations that other members of the public remained subject to the bank's allegedly deceptive practices were insufficient to state a claim under § 349). While Nebraskaland relies on *Bernstein v. JPMorgan Chase Bank, N.A.*, 775 F. Supp. 3d 701 (S.D.N.Y. 2025), the plaintiffs in that case were an elderly couple (not a business), and they supported their § 349 claim by pointing to statements on Chase's website advertising its robust fraud protections for elderly people. *Id.* at 706, 718–19. Nebraskaland's complaint contains no similar allegations.

At oral argument, Nebraskaland tried to draw a distinction between the first agreement it signed and the later ones, arguing that the first agreement could support a GBL § 349 claim because it was boilerplate and used by HSBC in similar situations with other customers. However, the complaint as written does not allege those things or adequately distinguish between the various agreements Nebraskaland signed. The Court therefore dismisses this claim as well, although it grants leave to amend to give Nebraskaland an opportunity to rectify these problems.

## IV. Nebraskaland can obtain declaratory relief but not lost profits

Finally, HSBC argues that Nebraskaland cannot seek consequential losses, including lost profits, or declaratory relief. At oral argument, counsel for Nebraskaland conceded that the parties' contract bars consequential losses, *see* MSA § 10.2(b), so the Court will grant Nebraskaland's motion to dismiss as to that requested relief.

However, the Court will not dismiss Nebraskaland's request for declaratory relief. Nebraskaland seeks a declaration that the indemnification agreements it signed are null and void. FAC, Prayer for Relief. That declaratory relief is not "duplicative" of the other relief Nebraskaland seeks (various forms of money damages). *Santander Consumer USA, Inc. v. Cnty. of Nassau*, 623 F. Supp. 3d 6, 23 (E.D.N.Y. 2022).

## CONCLUSION

For these reasons, HSBC's motion to dismiss is GRANTED as to Nebraskaland's tortious interference claim and its GBL § 349 claim. The motion is otherwise DENIED. Nebraskaland may file an amended complaint within 21 days of this order if it believes it can remedy the deficiencies identified above with respect to the dismissed claims. HSBC shall answer or otherwise respond to the complaint within 21 days after an amended complaint is filed, or 21 days after the deadline to amend expires, should Nebraskaland decline to amend.

The Clerk of Court is respectfully directed to terminate Dkt. 12.

SO ORDERED.

Dated: November 6, 2026
New York, New York

ARUN SUBRAMANIAN
United States District Judge